```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
                      HOUSTON DIVISION
```

| | |
|---|---|
| ITA UDEOBONG, d/b/a § | |
| MIDLAND CARE MEDICAL SUPPLY, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CIVIL ACTION NO. H-06-3197 |
| § | |
| SECRETARY OF HEALTH AND § | |
| HUMAN SERVICES, § | |
| § | |
| Defendant. § | |

MEMORANDUM AND ORDER

Pending is Defendant Secretary of Health and Human Services' Motion for Summary Judgment (Document No. 13). After having considered the motion, response, and the applicable law, the Court concludes as follows.

I. Background

Plaintiff Ita Udeobong ("Plaintiff") appeals a final determination by the Secretary of Health and Human Services (the "Secretary") that Plaintiff wrongfully received Medicare disbursements. *See* Document No. 1. On August 5, 2002, Plaintiff, owner of Midland Care Medical Supply, submitted an application to the National Supplier Clearinghouse (the "NSC"), a clearinghouse charged with reviewing Medicare applications, in order to be considered a Medicare-approved Durable Medical Equipment,

Prosthetics, Orthotics, and Supplies (DMEPOS) supplier. *See* Admim. Rec. 2519-2540; Document No. 13 at 7. Plaintiff also submitted a certificate of insurance to evidence the issuance of a required comprehensive liability insurance policy (the "putative policy") from Dallas Fire Insurance Company ("DFIC").[1] *See* Admin. Rec. 2124-25. The certificate of insurance for the putative policy was signed by Leola Moreau of Allstar National Insurance Agency ("Allstar"). *See* id. According to the certificate, the putative policy provided coverage from August 5, 2002, to August 5, 2003, and had a policy number of DFI6784564-01. *See* id. It is undisputed that Ms. Moreau, who signed the certificate of insurance as an "authorized representative," was a secretary for Allstar and was not a licensed insurance agent. Document No. 13 at 9; Document No. 14 at 4. Moreover, the uncontroverted administrative record evidence is that DFIC never wrote or issued the putative policy described in Ms. Moreau's certificate. *See* Admin. Rec. 2124-25; Document No. 13 at 7-8; Document No. 14 at 4.

In a September 9, 2002, letter, the NSC notified Plaintiff that his DMEPOS supplier application was approved and he was issued a Medicare billing number effective September 7, 2002. *See* Admin. Rec. at 1966. When no policy had been received from DFIC by

---

[1] Pursuant to 42 C.F.R. § 424.57(c)(10), an applicant to be a DMEPOS supplier must have "a comprehensive liability insurance policy in the amount of at least $300,000 that covers both the supplier's place of business and all customers and employees of the supplier."

September 19, 2002, Allstar's owner and sole licensed insurance agent, Mr. Ubak-Offiong, claims to have faxed to DFIC a certificate of insurance for issuance of such a policy.  *See* id. at 2607-08. DFIC then issued to Plaintiff on September 27, 2002, the required comprehensive liability policy, numbered DGL 052617, with effective dates from September 19, 2002, to September 19, 2003.  Id. at 1968-74.

In a letter dated June 10, 2003, Palmetto Government Benefits Administrators, L.L.C. ("Palmetto"), the carrier responsible for processing Plaintiff's Medicare claims, advised Plaintiff that all Medicare payments would be suspended as of that date due to information that an overpayment existed.  *See* id. at 2547. According to Palmetto, an investigation had allegedly revealed that the overpayment was made because Plaintiff's "entry into the Medicare program and [his] resulting claims submissions [had] been based upon fraudulently obtained or misrepresented proof of liability insurance."  *See* id.  In other words, Plaintiff wrongfully received Medicare disbursements after representing on his August 5, 2002, application that his business was covered by the prerequisite liability insurance when in fact it was not.  *See* id.

In a May 3, 2004 letter, Palmetto advised Plaintiff that the overpayment amounted to $2,293,608.39, and the carrier reiterated its finding that Plaintiff's "entry into the Medicare program was approved based on fraudulently obtained or misrepresented liability

insurance." Id. at 2426-27. Plaintiff requested a review of Palmetto's finding by a Palmetto fair hearing officer, *see* id. at 2424-25, who upheld Palmetto's decision to revoke Plaintiff's Medicare billing privileges.

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Id. at 2255-65. The ALJ found: (1) it had jurisdiction over the dispute; (2) on August 5, 2002, Plaintiff submitted his Medicare supplier enrollment application "together with a Certificate of Liability Insurance signed by [Ms.] Moreau, a secretary at [Allstar], showing Coverage by [DFIC]"; (3) the certificate signed by Ms. Moreau "reflected a 'DLI' policy number with effective coverage dates of August 5, 2002 to August 5, 2003, and show[ed DFIC] as the insurer"; (4) the "Certificate of Insurance signed by [Ms.] Moreau is invalid because Ms. Moreau is not a licensed insurance agent and does not have the authority to issue Certificates of Insurance or insurance binders"; (5) because the certificate is invalid the DFIC "comprehensive liability insurance policy DGL052617 [issued] on September 27, 2002 with coverage from September 19, 2002 to September 1[9], 2003 is likewise invalid"; (6) Plaintiff "did not have a valid comprehensive liability insurance policy when [his] enrollment application for a Medicare supplier number was submitted"; (7) Plaintiff was "overpaid $2,293,608.39 for durable medical equipment at issue in this case provided to 668 beneficiaries from

4

September 17, 200[2] through at least June 3, 2003, because [Plaintiff] did not have a valid comprehensive liability Insurance policy at any time from August 5, 2002 through September 19, 2003"; and finally (8) Plaintiff was "not without fault in causing the overpayment." *See* id. 178-79.

On August 8, 2005, the Departmental Appeals Board found the ALJ's decision was supported by substantial evidence and was legally sufficient. Id. at 3-4. It rejected Plaintiff's assertion that Mr. Ubak-Offiong's testimony that he resubmitted the certificate of insurance to DFIC with the proper signature after discovering the original certificate was signed by his secretary, Ms. Moreau, proved the DFIC policy was valid, stating: "The administrative record does not contain . . . any resubmitted Certificate of Insurance signed by Mr. Ubak-Offiong or other authorized individual." *See* id. at 4. Pursuant to 42 U.S.C. §§ 405(g) & 1395ff(b), Plaintiff then filed this suit seeking judicial review of the Appeals Board's--and thereby the Secretary's--decision. The Secretary now moves for summary judgment, arguing that (1) it applied the proper legal standards, and (2) its decision is supported by substantial evidence on the record as a whole.

## II. Standard of Review

Judicial review of Medicare-benefit cases "is limited to two issues: (1) whether the [Secretary] applied the proper legal standards; and (2) whether the [Secretary's] decision is supported by substantial evidence on the record as a whole." Estate of Morris v. Shalala, 207 F.3d 744, 745 (5th Cir. 2000) (per curiam) (applying the two-fold judicial review methodology to a Medicare benefits case); *see also* Gulfcoast Med. Supply, Inc. v. Sec'y, Dept. Health & Human Servs., 468 F.3d 1347, 1350 (11th Cir. 2006) (endorsing the two-fold judicial review methodology in a Medicare overpayment case). "Substantial evidence is more than a scintilla and less than a preponderance. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The Court "may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute [its] judgment for that of the Secretary, even if the evidence preponderates against the Secretary's decision." *See* Johnson v. Bowen, 864 F.2d 340, 343 (5th Cir. 1988).

If substantial evidence supports the Secretary's decision, then the only other potential ground for reversal is the application of an erroneous legal or procedural standard. Cook v. Heckler, 750 F.2d 391, 392-93 (5th Cir. 1985). No deference is afforded the Secretary's legal determinations; review of legal issues is *de novo*. *See* Western v. Harris, 633 F.2d 1204, 1206 (5th

Cir. 1981). Generally speaking, remand is the proper remedy when the law has been incorrectly assessed or applied in the administrative proceedings. *See* Leidler v. Sullivan, 885 F.2d 291, 294 (5th Cir. 1989) ("Where, however, the Secretary has relied on erroneous legal standards in assessing the evidence, he must reconsider that denial."); *see also* Ferran v. Flemming, 293 F.2d 568, 571 (5th Cir. 1961) (concluding, in a suit to recover disability benefits, that "when the fact-finder [the ALJ] has failed to employ the proper legal standard in making its determination the finding may not stand").

### III.  Discussion

The ALJ concluded that "[Plaintiff] was overpaid $2,293,608.39 . . . because [Plaintiff] did not have a valid comprehensive liability Insurance [sic] policy at any time from August 5, 2002 through September 19, 2003." *See* Admin. Rec. at 177-79. In so concluding, the ALJ reasoned that the comprehensive liability policy actually issued by DFIC to Plaintiff effective September 19, 2002, was invalid because it "was based on the unlawfully issued Certificate of Insurance." *See* id. According to the ALJ, the certificate of insurance was "unlawfully issued" and therefore "not valid because it was signed by an individual [Ms. Moreau] who unlawfully received the application and aided in the transaction of insurance business without a licence or certificate of authority,"

in violation of the Texas Insurance Code.  *See* id.  Thus, the ALJ's legal conclusion was that the certificate of liability insurance signed by Ms. Moreau, who held no license to sell insurance, and had no authority to issue a certificate of insurance, certifying a putative policy no. "DF16784564-01" for the recited policy period August 5, 2002, to August 5, 2003, rendered invalid an *actual* Comprehensive Liability Insurance Policy, No. DGL052617, that was in fact issued by Dallas Fire Insurance Company, dated September 27, 2002, with policy coverage from September 19, 2002, to September 19, 2003.  Hence, the legal question: Is an authentic comprehensive liability insurance policy that was actually issued by the insurer rendered invalid because an unauthorized, non-licensed person some weeks earlier had signed a certificate of insurance for a putative policy, under a different number, for a different coverage period, that was never issued by the insurer?

The ALJ cited no applicable authority, nor has the Court found any, holding that an insurance contract actually issued by an insurer and valid on its face is rendered invalid by the separate issuance of an invalid certificate of insurance.  Indeed, contrary to the ALJ's conclusion, courts have recognized that a certificate of insurance

> is not a part of the contract of, or necessary to, the insurance.  It is not included among the documents declared "to constitute the entire contract of insurance." . . . . It did not affect any of the terms of the policy.  It was issued to the end that the insured

> employee should have the insurer's statement of specified facts in respect of protection to which he had become entitled under the policy. It served merely as evidence of the insurance of the employee. [The insured's] rights and [insurer's] liability would have been the same if the policy had not provided for issue of the certificate.

Boseman v. Conn. Gen. Life Ins. Co., 57 S. Ct. 686, 690 (1937) (holding that delivery of the certificate in Texas had no bearing upon the question whether Texas or another state's law applies); see also U.S. Pipe & Foundry Co. v. U.S. Fid. & Guar. Co., 505 F.2d 88, 89 (5th Cir. 1974) (observing that a certificate of insurance "simply provides a method whereby [an insured] can show [a third party] that he has complied with a [contractual] provision requiring that insurance be obtained by the [insured]"). As one treatise explains, certificates of insurance like the instant one, are merely

> issued for informational purposes, in particular, for advising [a] third party of the existence and amount of insurance that has been issued to the named insured, since the named insured's contractual relationship with the third party requires that the named insured have a particular amount and type of insurance.

1 ALLAN D. WINDT, INSURANCE CLAIMS & DISPUTES: REPRESENTATION OF INSURANCE COMPANIES & INSUREDS § 6:37A (5th ed. 2007). A certificate of insurance is not an insurance contract, but represents to another "the issuance and existence of a policy." 3 ERIC MILLS HOLMES, HOLMES'S APPLEMAN ON INSURANCE § 11.2 (1998). Even the printed form of Ms. Moreau's unauthorized certificate of insurance recites: "THIS

CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER.  THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW."  *See* Admin. Rec. at 2124.

In sum, a certificate of insurance of the type issued by Ms. Moreau, even if valid, is not an insurance contract and adds nothing to, and detracts nothing from, any actual insurance policy. Moreover, there is no legal basis to conclude that an unauthorized and invalid certificate of insurance for coverage beginning on August 5, 2002, could or did in any way invalidate an authentic contract of insurance issued weeks later by Dallas Fire Insurance with coverage beginning September 19, 2002.  As a matter of law, the ALJ erred in her legal conclusion that, "Because the Certificate of Insurance issued by Leola Moreau is invalid, the Dallas Fire Insurance Company comprehensive liability insurance policy DGL052617 [issued] on September 27, 2002 with coverage from September 19, 2002 to September 1[9], 2003 is likewise invalid."

The ALJ cites in her Decision Texas Ins. Code Art. 21.01, section 2, in support of her opinion that Dallas Fire Insurance would not be required to pay a claim on the policy it issued because the "binder . . . was not valid because it was signed by an individual who unlawfully received the application and aided in the transaction of insurance business without a license or a certificate of authority."

10

Article 21.01 of the Texas Insurance Code, "Certificates of Authority," provides:

> It shall not be lawful for any person to act, as an agent or otherwise, in soliciting or receiving applications for insurance of any kind whatever in this state, or in any manner to aid in the transaction of the business of any insurance company incorporated in this state, or out of it, without first procuring a license or certificate of authority from the [Texas Department of Insurance].

TEX. INS. CODE ANN. art. 21.01, § 2 (Vernon 2003). Article 21.07, "Licensing of Agents," provides in pertinent part:

> No person or corporation shall act as an agent of any . . . insurance carrier licensed to do business in the State of Texas . . . unless he or it shall have first procured a license from the State Board of Insurance . . . .

TEX. INS. CODE ANN. art. 21.07 (Vernon 1998).[2]

Texas courts have almost invariably applied articles 21.01 and 21.07 of the Texas Insurance Code to invalidate commission-splitting contracts between uncertified or unlicenced insurance agents and insurance companies--which is not the situation

---

[2] Pursuant to Acts 2003, 78th Leg., ch. 1274, §§ 7, 26(a)(1), effective April 1, 2005, articles 21.01 and 21.07 were repealed and recodified as amended as Texas Insurance Code § 4001.101, subsection (a) of which provides: "Unless the person holds a license or certificate of authority issued by the [Texas Department of Insurance], a person may not: (1) solicit or receive an application for insurance in this state; or (2) aid in the transaction of the business of an insurer."

presented by the instant case.[3]  Moreover, as *Couch on Insurance* explains, the general rule is that:

> [s]tatutes pertaining to the licensing of insurance agents, brokers and solicitors do not prohibit a finding that the legal relationship of principal and agent exists, so as to bind the insurer, despite the failure of the person acting for the insurer to have been specifically licensed as its agent.

3 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE § 47:14 (3d ed. 1997). Again, there is no legal basis to conclude that the insurance policy issued by Dallas Fire Insurance, effective September 19, 2002, was invalid or unenforceable against Dallas Fire Insurance Company because of any prior conduct of Ms. Moreau in violation of Articles 21.01 and 21.07.

The Secretary has therefore relied on erroneous legal standards in holding invalid the Dallas Fire Insurance policy no. DGL052617 issued to Plaintiff for the policy period September 19, 2002, to September 19, 2003. The resulting decision that Plaintiff

---

[3] *See, e.g.*, Ins. Co. of N. Am. v. Morris, 981 S.W.2d 667, 681-82 (Tex. 1998) (citing a series of cases, "all refusing to enforce commission-splitting agreements with unlicenced persons because the underlying activity violated Articles 21.01 and 21.07 or their equivalents" (citing Benefits Admin. Corp. v. Rearick, 705 S.W.2d 234, 236 (Tex. Civ. App.--Texarkana 1986, no writ); Armstrong v. Tidelands Life Ins. Co., 466 S.W.2d 407, 409 (Tex. Civ. App.--Corpus Christi 1971, no writ); Tidelands Life Ins. Co. v. Armstrong, 414 S.W.2d 196, 197 (Tex. Civ. App.--Austin 1967, no writ); Perkins v. Lambert, 325 S.W.2d 436, 440 (Tex. Civ. App.--Austin 1959, writ dism'd); Stone v. Sterling Mut. Life Ins. Co., 127 S.W.2d 345, 347 (Tex. Civ. App.--Galveston 1939, no writ); Am. Const. Co. v. Kraft, 264 S.W. 636, 640 (Tex. Civ. App.--Galveston 1924, writ dism'd))).

"did not have valid liability insurance coverage . . . *at any time* from August 5, 2002 through September 19, 2003" (emphasis added), and that Plaintiff was therefore overpaid in excess of $2 million "from September 17, 200[2] through at least June 3, 2003," must be remanded for further proceedings.

## IV.  Order

Accordingly, it is

ORDERED that Defendant Secretary of Health and Human Services's Motion for Summary Judgment (Document No. 13) is DENIED, the decision of the Secretary is REVERSED, and this action is hereby REMANDED to the Secretary for further proceedings consistent with the foregoing.

The Clerk shall notify all parties and provide them with a signed copy of this Order.

SIGNED at Houston, Texas, on this <u>28th</u> day of August, 2008.

_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE